

Exhibit 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE: | ) CASE NUMBER 08-31630 |
| | ) |
| | ) |
| POSITIVE HEALTH MANAGEMENT,. | ) CHAPTER 7 |
| | ) |
| DEBTOR, | ) |
| | ) |
| RANDY WILLIAMS, | ) ADVERSARY NO. 10-03121 |
| CHAPTER 7 TRUSTEE. | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| VS. | ) |
| | ) |
| BBVA COMPASS BANK F/K/A | ) |
| COMPASS BANK, FIRST NATIONAL | ) |
| BANK, PROGRESSIVE COUNTY | ) |
| MUTUAL INSURANCE COMPANY, | ) |
| AND SYNERIMAGES HEALTHCARE | ) |
| CONSULTING, LLC | ) |
| | ) |
| DEFENDANTS. | ) |

ORAL DEPOSITION OF

# RANDY WILLIAMS

December 14, 2010
Volume 1

ORAL DEPOSITION OF RANDY WILLIAMS, produced as a witness at the

instance of the DEFENDANT, and duly sworn, was taken in the above-styled and

numbered cause on the 14th of December, 2010, from 9:26 a.m. to 11:04 a.m., before

Marisol Ramos, CSR in and for the State of Texas, reported by machine shorthand, at the

law offices of The Andersen Law Firm, 700 Louisiana, Suite

Southwest
Reporting
and Video
Service
Incorporated



826 Heights Blvd.
Houston, Texas 77007
Tel 713 650 1800
Fax 713 650 6245
800 544 3218
www.swreporting.com

Since 1972

Randy Williams

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

```
                                    )   CASE NUMBER 08-31630
IN RE:                              )
                                    )
POSITIVE HEALTH MANAGEMENT,.        )   CHAPTER 7
                                    )
          DEBTOR,                   )
                                    )
RANDY WILLIAMS,                     )   ADVERSARY NO. 10-03121
CHAPTER 7 TRUSTEE.                  )
                                    )
          PLAINTIFF,                )
                                    )
VS.                                 )
                                    )
BBVA COMPASS BANK F/K/A             )
COMPASS BANK, FIRST NATIONAL        )
BANK, PROGRESSIVE COUNTY            )
MUTUAL INSURANCE COMPANY,           )
AND SYNERIMAGES HEALTHCARE          )
CONSULTING, LLC                     )
                                    )
          DEFENDANTS.               )
                                    )
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

RANDY WILLIAMS

December 14, 2010

Volume 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF RANDY WILLIAMS, produced as a witness at

the instance of the DEFENDANT, and duly sworn, was taken in the

above-styled and numbered cause on the 14th of December, 2010,

from 9:26 a.m. to 11:04 a.m., before Marisol Ramos, CSR in and

for the State of Texas, reported by machine shorthand, at the.

law offices of The Andersen Law Firm, 700 Louisiana, Suite

**Randy Williams**

---

**2**

1  2770, Houston, Texas, pursuant to the Federal Rules of Civil
2  Procedure and the provisions stated on the record or attached
3  hereto.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**4**

1                        INDEX
                                         PAGE
2
   Appearances.............................................3
3
4  RANDY WILLIAMS
      Examination by Mr. Yollick..........................5
5      Examination by Mr. Durrschmidt....................37
6
   Signature and Changes...................................62
7
   Reporter's Certificate..................................64
8
   No Exhibits Marked
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**3**

1            A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
      KIRK KENNEDY
4      ATTORNEY AT LAW
      P.O. BOX 3502
5      HOUSTON, TEXAS 77253
6  FOR THE DEFENDANT, FIRST NATIONAL BANK:
      ERIC YOLLICK
7      YOLLICK LAW FIRM, P.C.
      6110 FM 1488
8      MAGNOLIA, TEXAS 77354
      281.363.3591
9      281.363.0488 FAX
      ERICYOLLICK@SWBELL.NET
10
   FOR THE DEFENDANT, COMPASS BANK:
11      MICHAEL J. DURRSCHMIDT
      HIRSCH & WESTHEIMER, P.C.
12      700 LOUISIANA, 25TH FLOOR
      HOUSTON, TEXAS 77002-2729
13      713.220.9165
      713.223.9319 FAX
14      MDURRSCHMIDT@HIRSCHWEST.COM
15
16
17
18
19
20
21
22
23
24
25

---

**5**

1                     RANDY WILLIAMS,
2  having been first duly sworn, testified as follows:
3                     EXAMINATION
4  BY MR. YOLLICK:
5      Q.  Would you please state your name, sir?
6      A.  Randy Williams.
7      Q.  Mr. Williams, as I understand it, you are the Chapter
8  7 trustee for Positive Health Management; is that correct?
9      A.  Yes.
10      Q.  And that is a bankruptcy proceeding pending before
11  Judge Bohm here in Houston, correct?
12      A.  Yes.
13      Q.  When were you appointed the Chapter 7 trustee?
14      A.  When the case when was converted.  I don't remember
15  the date.
16      Q.  The case was originally filed as a Chapter 11?
17      A.  Yes.
18      Q.  And was it Ronald Ziegler who signed the petition?
19      A.  I believe it was, yes.
20      Q.  When you were appointed the Chapter 7 trustee, did
21  you ever have an opportunity to interview Doctor Ziegler?
22      A.  Not while I was Chapter 7 trustee.
23      Q.  Did you have an opportunity to interview Doctor
24  Ziegler prior to your being appointed Chapter 7 trustee?
25      A.  Yes, after I was appointed Chapter 11 trustee --

---

2  (Pages 2 to 5)

14

```
1   company that had it, and they were in – in effect made the
2   argument to the certification people that we're just creating
3   new business but we're in the same space, that they just got a
4   new certification.
5         Now, clearly I think they piggy-backed it off
6   the fact that Positive had it. But I mean at the end of the
7   day, what the certification amounted to is would you pay the
8   fees to say I want to be certified and just submit the
9   application, which was, I mean, pretty lengthy. But they had
10  done it before for Positive, so it was a matter of
11  regurgitating it with a new company name on it. And then you
12  had – you then got the ability to pay the additional price of
13  having somebody come out and actually do an inspection process,
14  which is basically walking through and seeing if you had
15  certain equipment and people had certain licenses or held
16  certain specifications or had certain degrees to verify
17  on-site, and then you were certified.
18        And so I – that never – that never was a big
19  issue for me. I mean, I – what got priority business was the
20  fact that it was doing business with all the people that
21  Ziegler had done business with all along, and he simply said
22  don't send your people here anymore, send them here now. I'm
23  not even sure to the extent he even was out there telling
24  people that there was a difference. And, you know, outwardly,
```

15

```
1   mean, that building was not in an area that really you would
2   associate with a lot of health care facilities. It didn't have
3   a look. I mean, it just looked like kind of a nondescript
4   small little commercial building, but – I mean from the
5   outside. I mean, you know, I could remember when I went out
6   there, I was like trying to figure out which part of it was
7   which, and which part of it was supposedly Positive, because it
8   just didn't – I mean, there was nothing that sort of
9   identified it. I don't remember any signage or anything.
10  Q.   This is the building on Pebble Lane?
11  A.   It's –
12        MR. KENNEDY: The Bend.
13        THE WITNESS: The one up north.
14  Q.  (By Mr. Yollick) Pebble Bend?
15        MR. KENNEDY: Pebble Bend.
16  Q.  (By Mr. Yollick) Okay. As far as you know, were
17  there any tangible assets that were transferred from
18  Positive – other than cash, from Positive Health to Priority
19  Healthcare?
20  A.   Well, I mean, there was a dispute as to whether there
21  were. He claimed that he had taken everything that was
22  Positive's and stuck it in a storage building. And of course,
23  all that was older, broken stuff. And, you know, we were
24  sitting there in this space that, up until recently, had
25  been – was supposed to be the debtor's, and I was like, well,
```

16

```
1   who's is this and he goes mine. Who's is that? I think that's
2   Kimberly's. I mean, it was just this – yeah, I mean, it was a
3   game to him. So I said you mean to tell me that all this
4   wasn't Positive's? I mean, isn't some of this stuff in the
5   schedules as being Positive's? He said no, all that's in
6   storage. All this came from other people, other things. Was
7   never paid for by Positive. Well, can you show me where that's
8   the case where you paid for it? Sue me. I mean everything
9   that day was, when it got to a point, was sue me.
10  Q.   Who was the owner of the real estate, if you know?
11  A.   It was one of his entities. I think it still was and
12  I think at the time when I first got appointed as 11 trustee,
13  it was in its own bankruptcy and was, I think, in a dispute
14  with your client about –
15  Q.   Okay.
16  A.   – the mortgage on the building.
17  Q.   So when you –
18  A.   Or your client may have saved that. I can't remember
19  exactly, but I think your client may have refinanced it to save
20  it or – I don't know. One of his other companies actually
21  owned the building and was in a dispute over the mortgage on
22  the building, and there was the issue about whether or not he
23  was even going to be able to keep the building at the time.
24  Q.   At one point Doctor Ziegler or Mr. Ziegler filed a
25  Chapter 11 in I believe it was in Judge Paul's court.
```

17

```
1   A.   Uh-huh.
2   Q.   And it was I think for Ziegler Enterprises III. And
3   then there was a refinancing where my client was actually paid
4   off where Ziegler Enterprises II took over that building and
5   financed it with someone else.
6         When you visited the building had that
7   transaction already occurred?
8   A.   I don't think the first time I went out there that –
9   I don't think that had been resolved yet. I think that's what
10  the plan was.
11  Q.   Okay.
12  A.   But I know even after that happened, it was – it
13  seemed like days if not weeks, before he was in default again.
14  And I know that he ultimately lost – lost the building to the
15  company that – or the individual or the company that
16  refinanced it.
17  Q.   Since we're talking about these transfers, let me go
18  one step back to Positive Pain. Are you familiar with that entity?
19        Are you familiar with that entity?
20  A.   Yes.
21  Q.   As I understand it, there was an entity called
22  Positive Pain Management, Inc. or maybe LLC that Ziegler had
23  used for a similar business at one point; is that correct?
24  A.   I think – yeah. I mean, originally I think Positive
25  Pain was what he operated the pain business through. And then
```

5 (Pages 14 to 17)

**Randy Williams**

18

1  at some point, he used -- what is it?  I think at some point
2  that he comes along and uses the name Positive Health without
3  there actually being a Positive Health.  And then I think it
4  goes back to Pain for a little while and then finally comes --
5  forms Positive Health and then is Positive Health.  And that
6  was sort of the end leading up to the -- then ultimately the
7  bankruptcies.
8      But, you know, at one point in time, I mean, I
9  think Pain, and for a limited time, you know, Health, I mean,
10  there were operations in several cities, not only Houston.  I
11  mean, Houston was what was only -- it was what was left after
12  everything else was, you know, being shut down or shut down.
13  And I attempted to get some understanding from him as to what
14  happened, you know, why it built up into such an enterprise and
15  had all these offices and all these operations and then
16  collapsed, but he -- he never really would talk about what
17  had -- what had caused it or what was going on.
18      Q.  Was there some sort of transfer, though?  And I don't
19  mean in a legal sense, like the phrase fraudulent transfer, but
20  I mean in a, you know, business sense.  Was there a transfer by
21  bill of sale or by, you know, some other mechanism that you
22  know of from Positive Pain to Positive Health?
23      A.  I don't know that he ever formally did anything.  I
24  think people -- after -- people after the fact would find out
25  that there was this new entity, then they came back and said

19

1  wait a minute, all our transactions were in the name of this
2  other entity.  Where is it.  What is it.  No, no, I'm over here
3  doing this now.  Well, okay, we have to do redo everything for
4  that entity now because you simply can't just take what we had
5  and just create a new entity and assume that we're still under
6  the same agreements with it.  He -- he just tended to do things
7  and worry later about whether or how he'd catch up.  At least
8  that was my impression.
9      Q.  So what do you believe, then, is the relationship
10  between the corporation that was Positive Pain and the
11  bankruptcy debtor, which is Positive Health, or do you not
12  know?
13      A.  It's -- it's a successor to the business, and it's a
14  successor to a lot of liabilities.  I mean, I think it's --
15  like I say, as people found out that Positive was out there --
16  Positive Health was out there, as opposed to Pain, that they
17  came back and said, look, you know, we had this agreement over
18  here, if you're going to continue to operate over here, and
19  this is where the money's being generated, then we have to have
20  an agreement with you.  So rather than being able to start
21  afresh and start anew.  So rather than being able to start
22  things.  If you look at where Positive Health is now, some of
23  those liabilities would have actually been carryovers from the
24  Positive Pain business.  But I mean the business that Positive
25  Health did, based on the information I've been told, you know,

20

1  was the same kind of business that Positive Pain was doing.  I
2  mean, it wasn't like they added something new or did something
3  different, other than, like I said, when Positive Health had
4  it, it began to shrink.
5      Q.  There is a lady by the name of Jennifer Floren.  Was
6  she married to Ron Ziegler?
7      A.  It's my understanding she -- she was married to him
8  at some point, and then divorced him prior to the -- at some
9  point in there, in this conversion between Pain to Health.
10  She's -- she's one of the ones who, as a result of the divorce,
11  had claims initially against Pain, only then to later come to
12  find out that it was effectively no longer doing business and
13  he was now doing business as Health.  And then had her lawyer,
14  you know, go after him and say, you know, look, you weren't
15  supposed to do that.  You know, we had -- I mean, I think it's
16  in the divorce decree she had with him.  So they had to
17  restructure part of that transaction.
18      Q.  And where does -- if you know, where does Ms. Floren
19  live now?
20      A.  She's up in Dallas.
21      Q.  And is her name Floren or --
22      A.  Uh-huh.
23      Q.  "Yes"?
24      A.  Yes.
25      Q.  And I saw -- I think that you had an adversary

21

1  proceeding with her, is that right?
2      A.  Yes, because she -- because there is a period of time
3  that Health was directly making alimony payments, Ziegler's
4  alimony payments to her.
5      Q.  And so did you settle with her?
6      A.  Yes.
7      Q.  Was there, if you know, a corporate-type counsel, you
8  know, or a corporate attorney who was advising Doctor Ziegler
9  prior to the filing of the bankruptcy?
10      A.  I know he used a number of different counsel.  I've
11  never been able to really in my own mind figure out where
12  people -- whether people were his lawyer or one of the entity's
13  lawyers or if they were everybody's lawyer, and how to -- if
14  they were trying to do that, there wasn't some conflict.  I
15  mean I know he had counsel in the divorce.  I know he had
16  counsel for the bankruptcy, and I know there were other lawyers
17  that got involved in different litigation things, but I never
18  got the impression, after I talked to him, that he was going to
19  lawyers or accountants or others seeking business advice on how
20  to structure or run things.  It seemed like more that the
21  lawyers got involved after the fact once somebody was
22  complaining, and then they had to fix whatever somebody was
23  complaining about.
24      Q.  So as far as you know, then, there was not some
25  lawyer or accountant who was sort of giving Ziegler overall

6 (Pages 18 to 21)

**Randy Williams**

---

**22**

1    advice on how to run these things?

2        A.  It was not my impression.

3        Q.  There's a lawyer named, I think, Scott McKinsey.  As

4    far as you know, did he ever represent Ron Ziegler?

5        A.  I don't recall.  I don't know.

6        Q.  Who represented Ziegler in the divorce, if you know?

7        A.  I don't remember the name.  I mean, I've seen it and

8    stuff, but I don't remember the name.

9        Q.  My recollection is I think there are four defendants

10   in this adversary proceeding.  One is my client, First National

11   Bank; one is BBVA Compass, Mr. Durrschmidt's client; there is a

12   Progressive County Mutual Insurance Company, and I think

13   there's also a company called Synerimages.

14       Is it correct that you have settled with

15   Progressive County Mutual Insurance?

16       A.  I believe that's right, yes.

17       Q.  And then have you also settled with Synerimages?

18       A.  I think that's right.  I — I — yeah.

19       MR. KENNEDY:  Uh-huh.

20       Q.  (By Mr. Yednock)  Was Synerimages involved in

21   post-petition transfers, or at least that's your allegation?

22       A.  I don't think that's right.  I don't — sitting here

23   right now, I don't recall specifically what the deal — what

24   the transactions were — was with Syner.

25       Q.  Was First National Bank involved in post-petition

---

**23**

1    transfers?

2        A.  So many of these do and don't and cross both ways and

3    without...

4        Q.  You're looking at your amended complaint?

5        A.  Yes.

6        Q.  So my question is:  Was First National Bank — are

7    you alleging that First National Bank was involved in

8    post-petition transfers?

9        A.  All the — all the dates of the transfers that we

10   have for First National Bank predate the petition.

11       Q.  Just since we're on the topic, are you alleging that

12   BBVA Compass was involved in post-petition transfers?

13       A.  No.  There are no post-petition transfers.

14       Q.  Would you tell me what is the factual basis for your

15   allegation that First National Bank was involved in fraudulent

16   transfers?

17       A.  That Positive was not a debtor of the bank.  The

18   lending relationship was with Ziegler and his other companies,

19   but funds were taken from Positive and used to satisfy those —

20   those liabilities of Mr. Ziegler and his other companies.

21       Q.  And when you say "Positive," you're referring to

22   Positive Health Management; is that correct?

23       A.  The debtor, yes.

24       Q.  Are you alleging that First National Bank had some

25   knowledge or that some person within First National Bank had

---

**24**

1    knowledge that the transfers were somehow improper?

2        A.  No, I don't think that's part of it.  I mean, I think

3    it's — I'm sure at some point somebody could have looked at it

4    and said, you know, why are we getting checks or payments from

5    this account when this isn't our borrower, but I know that

6    bank's typically never look at that stuff and that's not part

7    of the proof in whether the transfer is fraudulent.  I mean,

8    it's more to do with the party that's making the transfers

9    intent and the party receiving the transfer, and whether — you

10   know, the facts surrounding what's going on at the time of the

11   transfer.  So I mean that's not part of what we're — what's

12   complained about.

13       Q.  What is the factual basis of your allegation that the

14   party making the transfer had a fraudulent intent with respect

15   to the First National Bank payments?

16       A.  Well, I think the allegations for the fraudulent

17   transfers here aren't so much they were intended to delay

18   and/or defraud creditors.  Rather there was no consideration

19   since the First National Bank didn't have a claim against

20   Positive, and that at the time the transfers were made Positive

21   was already insolvent.

22       Q.  What do you mean by "insolvent"?

23       A.  Liabilities exceeded its assets, wasn't paying its

24   debts in the regular course of business when they came due.  I

25   mean, it was insolvent.

---

**25**

1        Q.  At the time that the payments were made to First

2    National Bank, were the current liabilities in excess of the

3    current assets of Positive Health?

4        A.  I think you've seen the expert report and that's what

5    we went out and had looked at the time.  I mean, it says

6    what it said.  I didn't independently go out and do the work

7    that we got the expert to do.

8        Q.  So you personally don't know?

9        A.  Other than reviewing the expert report, no.

10       Q.  At some point, either when you became the Chapter 11

11   trustee or when you became the Chapter 7 trustee, did you take

12   possession of any physical property of the debtor?

13       A.  Yes.  I mean, over — over various times, I mean, we

14   had records turned over and took over property that was in

15   storage facilities or properties that made its way to priority.

16   I mean, over the course of the last couple of years, I mean,

17   that's gone on.

18       Q.  I just remember, Mr. Williams, one time I was

19   involved in a bankruptcy with you, I think it was a company

20   call Floor Crafters or something like that, and you were very

21   thorough in making sure that you took possession of all the

22   books and records of that company.  And I guess my question is:

23   In this bankruptcy, were you — did you attempt to take all the

24   books and records of the debtor at the time that you became the

25   Chapter 11 or the Chapter 7 trustee?

---

**Southwest Reporting & Video Service, Inc.  Registration #189**

713-650-1800                                          production@swreporting.com

**Randy Williams**

---

30

1  a report by someone who reviewed the available information that
2  we had. I assume all that information's available to you if
3  you want it. And beyond that, I'm not sure what else there
4  would be, if he -- if he -- if there was a liability with
5  someone whom he never paid and who's never come forward that
6  either sued or appeared in the bankruptcy. Now that
7  Mr. Ziegler's dead. I don't know how you would find out how
8  such a person or entity existed.
9      Q. Well, I guess, here's what my question, though is,
10  Mr. Williams, if you wanted to go back and look and see what
11  were the liabilities of Positive Health during the time period
12  when First National Bank received the payments that you're
13  making the basis of this lawsuit, what records would you look
14  at specifically?
15      A. You'd have to start with the schedules and statements
16  and work backwards off the bills that he was paying.
17      Q. So obviously you would look at the schedules and
18  statements filed with the bankruptcy court, you would look at
19  the bank statements to see what expenses were actually paid.
20  Are there any other books and records of Positive Health that
21  you could look at besides what I just named?
22      A. I don't -- we're going round and round in this,
23  because, again, you're getting back to -- your question gets
24  back to the point that you want to believe that there exists a
25  universe where Mr. Ziegler took in a cubby hole the financial

31

1  records of this company. That does not exist. And so from
2  that standpoint, now that he is deceased, you have to do the
3  best you can with reconstructing from what you can that's
4  available. And that's going to start, again, with what I said.
5  You're going to start with the schedules and statements and
6  work backwards from what you see coming in and out of the bank
7  account and what you know from the relationships that the
8  parties had. I didn't do the expert report.
9      Q. I understand.
10      A. I don't know if I have the background to opine, you
11  know, in the way an accountant would on that. And so I mean to
12  the extent that what we relied on, someone deems as
13  insufficient, then, you know, that goes to the credibility of
14  the report. But we are not dealing with something here where
15  this stuff was kept in a way that you could simply say, okay,
16  give me Box A and let's look at 2006, and this is every
17  contract, every liability, every payable you had. We now know
18  the universe. That -- that doesn't exist.
19      Q. But I guess what I'm really asking is -- and I
20  understand that there is nothing that's a nice, you know, set
21  out balance sheet or income statement or something like that.
22          But is there a stack of contracts, for example,
23  somewhere, or is there a box that's got one contract and
24  another box that has three Christmas cards and one and a half
25  contracts? I mean what I'm wondering is --

32

1      A. What kind of contract?
2      Q. Whatever they might be that would show liabilities of
3  this entity in order to --
4      A. I don't know that.
5      Q. -- in order to do a solvency or insolvency analysis.
6      A. I don't know that this is the -- I don't -- I
7  don't -- I don't...
8      Q. Can I offer a suggestion?
9      A. This business is -- is not the kind of business
10  that's going to have a slew of contractual liability associated
11  with it. I mean, most -- it's -- its ongoing payables and --
12  and expenses are going to tell you most of the people that it's
13  dealing with and what its relationship with them is. I mean,
14  there's -- there's the idea that if you look at who's getting
15  paid on a monthly basis by this and aren't going capture a
16  picture of who Positive, the debtor, owed money to, I mean I
17  think that is a pretty good picture. Because, again, I don't
18  think that there's this universe of people that exist out there
19  that had relationships with Positive that never came forward
20  and are owed money by Positive.
21          If anything, it's the other end. Is there --
22  because Positive Health, at some point, became the cash cow of
23  the Ziegler enterprises. It was used to pay lots of different
24  bills, not only for itself, but for other people. Ziegler had
25  no other -- I mean, these real properties that he brought, I

33

1  mean, he even told me that the building he had out there,
2  that -- what he planned to do with it in terms of getting other
3  people in it and Positive in it and all that, it never had
4  happened. He couldn't get reliable tenants that would pay him
5  money on a monthly basis. That's why he was in trouble with
6  it. You know, that kind of thing.
7          The -- the Pain business had gone through all of
8  it's issues, so that he had been -- made this transformation
9  to Health, in part, I think, to try and move away from some
10  liabilities and may have left some behind in Pain.
11      Q. Mr. Williams, let me offer --
12      A. But I don't -- I just don't know that there exists
13  this world of -- of a box of things I could go look at and say,
14  yes, this is what you would to look at and this would tell you
15  the liabilities of the company.
16      Q. Let me offer you a suggestion. Your attorney
17  obviously has some -- I'm just trying to identify documents,
18  really, and not analysis. Why don't we take a short break and
19  allow Mr. Kennedy to refresh your recollection. However --
20      A. I don't need him to refresh my recollection.
21      Q. Well, but I --
22      A. If -- if the issue had been that you wanted to have
23  me subpoena duces tecum with this deposition and have me bring
24  documents and testify about documents today, I think I'd have a
25  subpoena duces tecum. I don't have one and so you're asking me

---

9  (Pages 30 to 33)

Randy Williams

**Page 38**

1    Bank.
2    A.  Yes, sir.
3    Q.  Compass Bank had a loan to Ziegler Enterprise II,
4    LLC.  Are you familiar with that?
5    A.  You know, based on what's come up in the pleadings
6    and everything, yes.
7    Q.  Okay.  So the only way that you know anything about
8    this is what you read in the amended complaint?
9    A.  Well, not only in the amended complaint, but
10   what's -- what's come up in the litigation over the issue.  I
11   mean, we were looking at the payments.  We looked into why we
12   thought they were made to Compass, and that's where it came up
13   that it appeared that there was a loan with Ziegler
14   Enterprises.  I mean, I'm not trustee for Ziegler Enterprises
15   II or any of Mr. Ziegler's other entities, so I mean that's
16   what we believe to have been the relationship.
17   Q.  Do you know what building Ziegler Enterprises II
18   owned?
19   A.  I just know it was in San Antonio.
20   Q.  Do you know that that was the same building that
21   Positive Health leased space from?
22   A.  It's my understanding that Positive Pain and Positive
23   Health operated a pain clinic over there in San Antonio.
24   Q.  Do you know if it was in the building that served as
25   Compass Bank's collateral?

**Page 39**

1    A.  I think it was.
2    Q.  Okay.  Have you seen the lease agreement between
3    Positive Health and Positive Pain and Ziegler Enterprise II?
4    A.  No.
5    Q.  Do you know if one exists?
6    A.  I don't.
7    Q.  Have you made any kind of search for that document?
8    And by "you," I mean you or your agents.
9    A.  Not that I recall.
10   Q.  Did you ever have a conversation with Martha Jester
11   regarding Positive Health?
12   A.  I don't recall.
13   Q.  Martha Jester was the CPA for Positive Health.  She
14   lives in Richmond, Texas.  Does that reflect refresh your
15   recollection?
16   A.  I don't recall.
17   Q.  All right.  She prepared the tax returns.
18   A.  If you -- yeah, okay.
19   Q.  You still don't recall?
20   A.  I don't.
21   Q.  I'm just trying to give you --
22   A.  I don't recall.
23   Q.  All right.  That's fair enough.
24       Are there any checks that are payments of rent
25   by Ziegler -- by Positive Health to Ziegler Enterprise II?

**Page 40**

1    A.  I don't know.
2    Q.  Okay.  Do you know why Positive Health made the
3    payments to Compass Bank that you complain of in the second
4    amended complaint?
5    A.  I just know that they were made.
6    Q.  Okay.  And earlier you had testified with regards to
7    First National, that the reason that the lawsuit was filed
8    essentially was because payments were made by the debtor to a
9    bank with which it didn't have a lending relationship.
10       Is that the same situation you have with
11   Compass?
12   A.  Yes.
13   Q.  Okay.  So the -- the analysis -- the analysis for
14   bringing the lawsuit was payments made by the debtor to
15   Compass Bank and the debtor didn't have a loan agreement or a
16   guarantee with Compass Bank, and, therefore, it was --
17   A.  We didn't -- yeah.  There was nothing that I saw that
18   indicated that Positive Health, the debtor, owed money to
19   Compass.
20   Q.  Right.  But you do know that Positive Health owed
21   money to Ziegler Enterprises II for rent?
22   A.  No.
23   Q.  Well, you just testified that Positive Health leased
24   space at Ziegler Enterprises II's building in San Antonio.
25   A.  No, I didn't.

**Page 41**

1    Q.  Okay.
2    A.  I agreed with you that Positive Health, at one point,
3    operated a pain clinic in San Antonio that probably is the same
4    building that we're talking about here that Compass Bank had a
5    lien on.  I don't know that there was a lease.  I don't know
6    what the relationship was that Mr. Ziegler created between the
7    debtor and the owner -- the entity that owned the building and
8    what -- what the arrangement was.
9    Q.  Let me ask you this question:  There's been a number
10   of adversaries filed on your behalf against a number of
11   different parties alleging preferences of fraudulent transfers,
12   some -- 50 some-odd defendants.  Correct?
13   A.  Yes.
14   Q.  The -- a lot of those payments, you allege, were
15   payments made by the debtor to entities with which the debtor
16   didn't have contractual relations.
17   A.  Yes.
18   Q.  In going through Positive Health's books, did you
19   see -- is there a stock ledger?
20   A.  I can't recall.
21   Q.  Okay.  Did you find a corporate meeting book?
22   A.  I can't recall.  I mean, I just -- I can't recall
23   sitting here now.
24   Q.  Okay.  Did you see any corporate resolutions by
25   Positive Health for any of their actions?

11  (Pages 38 to 41)

**Randy Williams**

42

```
1      A. I don't recall.
2      Q. You testified earlier during the deposition that you
3   believe that Doctor Ziegler sent money out of Positive Health
4   wherever he felt it needed to go to resolve whatever problem he
5   felt he had.
6      A. Well, more or less.
7      Q. Okay. Do you know how many different companies
8   Doctor Ziegler had operating during the 2006, 2007 time period?
9      A. I mean, several would be -- I don't know
10  specifically.
11     Q. Okay. And that's fair enough. There is a -- he had
12  certain real estate companies, right, which are Ziegler
13  Enterprise I, II, III, IV, V that owned certain real estate?
14     A. He had entities that -- I know that he had entities
15  that owned real estate, yes.
16     Q. Okay. And the purpose was -- for those real estate
17  entities was that they would own building in which his other
18  companies would then occupy space?
19     A. I don't know what the purpose was for him buying the
20  real estate.
21     Q. When did you get appointed Chapter 11 trustee,
22  roughly? I mean, let me ask you this way: Was Doctor Ziegler
23  still alive when you got appointed Chapter 11 trustee?
24     A. Yes.
25     Q. And how many discussions did you have with him about
```

43

```
1   the operation of his business?
2      A. I think I testified that we visited a few times in
3   court and he agreed to let me come out and interview him at his
4   office with his attorney.
5      Q. Did you do that?
6      A. Yes.
7      Q. And who was his attorney? Was that Sharp? Michael
8   Sharp?
9      A. It was Michael Sharp at the time.
10     Q. Who was the office manager to the debtor at that
11  time?
12     A. I don't recall.
13     Q. Did you meet with him or her?
14     A. I met with some of the people who were there at the
15  office that day, but I don't recall who they were.
16     Q. Did you keep any notes of that?
17     A. I may have. I don't know.
18     Q. Who retained Mr. Longaker?
19     MR. KENNEDY: What do you mean by "retained"?
20     THE WITNESS: Well, it was something that
21  Mr. Kennedy and I discussed, and since he was going to be
22  special counsel he hired him to do a report.
23     Q. (By Mr. Durrschmidt) Okay. Have you seen the
24  engagement letter?
25     A. I don't recall.
```

44

```
1      Q. Okay. Do you know what the terms of the engagement
2   are?
3      A. I don't recall sitting here.
4      Q. You don't know what his fee arrangement is?
5      A. I don't remember.
6      Q. You haven't made any payments out of the estate to
7   him, have you?
8      A. Not that I recall.
9      Q. Do you know when he was retained?
10     A. No, I don't recall.
11     Q. Was it more than three months ago?
12     MR. KENNEDY: He's going to be here. You can
13  ask him.
14     THE WITNESS: I don't recall. It was more than
15  three months ago, but I don't recall when it was.
16     Q. (By Mr. Durrschmidt) Have you ever met with
17  Mr. Longaker?
18     A. Mr. Longaker, I've met many times over the years. I
19  mean, with respect to this case, I think he and I talked maybe
20  once or twice.
21     Q. Is it your testimony that, as far as you know,
22  there's no record in the debtor's books and records of a lease
23  agreement between the debtor and Ziegler Enterprise II, LLC
24  regarding this San Antonio building?
25     MR. KENNEDY: Objection, misstates his
```

45

```
1   testimony. He already testified.
2      MR. DURRSCHMIDT: I asked him if that was his
3   testimony. He can answer the question.
4      THE WITNESS: I'm not aware of any lease between
5   the debtor and Ziegler Enterprises that owned the building in
6   San Antonio.
7      Q. (By Mr. Durrschmidt) Have you seen any lease between
8   the debtor and any other Ziegler Enterprise entity?
9      A. No.
10     Q. Have you seen any lease agreement by the debtor and
11  any other party?
12     A. I think early on there may have been some equipment
13  leases, and then there was a lease agreement for storage space.
14  But other than -- other than those -- and I don't recall who
15  they were with -- I don't -- I don't ever recall seeing legal
16  contractual agreements between the debtor and any of the other
17  Ziegler entities or, you know, the business that succeeded
18  from Positive Pain.
19     And since a lot of these facilities originated
20  with Pain -- and, again, as I told Mr. Yollick, I mean, it
21  became news to people that all of a sudden it wasn't Positive
22  Pain anymore; that it was Positive Health. Because from
23  everything that we've seen, it wasn't as though Mr. Ziegler
24  went out and announced to the world or to everybody he was
25  doing business with that he was making that switch. And a
```

12 (Pages 42 to 45)

**Randy Williams**

<table>
<tr><td colspan="2">

**62**

CHANGES AND SIGNATURE

WITNESS NAME: RANDY WILLIAMS   DATE OF DEPOSITION: 12/14/10

PAGELINE   CHANGE   REASON

</td><td colspan="2">

**64**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

</td></tr>
</table>

| | 62 | | 64 |
|---|---|---|---|
| 1 | CHANGES AND SIGNATURE | 1 | IN THE UNITED STATES BANKRUPTCY COURT |
| 2 | WITNESS NAME: RANDY WILLIAMS   DATE OF DEPOSITION: 12/14/10 | 2 | FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION |
| 3 | PAGELINE   CHANGE   REASON | 3 | IN RE:                    ) CASE NUMBER 08-31630 |
| 4 | _____ | | ) |
| 5 | _____ | 4 | POSITIVE HEALTH MANAGEMENT,  ) CHAPTER 7 |
| 6 | _____ | 5 | DEBTOR,          ) |
| 7 | _____ | 6 | RANDY WILLIAMS,        ) ADVERSARY NO. 10-03121 |
| 8 | _____ | | CHAPTER 7 TRUSTEE.     ) |
| 9 | _____ | 7 | ) |
| 10 | _____ | 8 | PLAINTIFF,       ) |
| 11 | _____ | 9 | VS.             ) |
| 12 | _____ | 10 | BBVA COMPASS BANK F/K/A    ) COMPASS BANK, FIRST NATIONAL ) |
| 13 | _____ | 11 | BANK, PROGRESSIVE COUNTY   ) MUTUAL INSURANCE COMPANY,   ) |
| 14 | _____ | 12 | AND SYNERIMAGES HEALTHCARE  ) CONSULTING, LLC        ) |
| 15 | _____ | 13 | ) DEFENDANTS.       ) |
| 16 | _____ | 14 | |
| 17 | _____ | 15 | REPORTER'S CERTIFICATION DEPOSITION OF RANDY WILLIAMS |
| 18 | _____ | 16 | December 14, 2010 |
| 19 | _____ | 17 | I, Marisol Ramos, Certified Shorthand Reporter in and for |
| 20 | _____ | 18 | the State of Texas, hereby certify to the following: |
| 21 | _____ | 19 | That the witness, RANDY WILLIAMS, was duly sworn by the |
| 22 | _____ | 20 | officer and that the transcript of the oral deposition is a |
| 23 | _____ | 21 | true record of the testimony given by the witness; |
| 24 | _____ | 22 | That the deposition transcript was submitted on |
| 25 | _____ | 23 | _____ to the witness or to the attorney for the |
| | | 24 | witness for examination, signature and return to me by |
| | | 25 | _____; |

| | 63 | | 65 |
|---|---|---|---|
| 1 | I, RANDY WILLIAMS, have read the foregoing deposition | 1 | That the amount of time used by each party at the |
| 2 | and hereby affix my signature that same is true and correct, | 2 | deposition is as follows: |
| 3 | except as noted above. | 3 | MR. ERIC YOLLICK............01 HOURS:01 MINUTE(S) |
| 4 | | 4 | MR. MICHAEL DURRSCHMIDT.....00 HOURS:37 MINUTE(S) |
| 5 | _____ | 5 | MR. KIRK KENNEDY............00 HOURS:00 MINUTE(S) |
| 6 | RANDY WILLIAMS | 6 | That pursuant to information given to the deposition |
| 7 | THE STATE OF _____ | 7 | officer at the time said testimony was taken, the following |
| 8 | COUNTY OF _____ | 8 | includes counsel for all parties of record: |
| | | 9 | Mr. Kirk Kennedy, Attorney for the Plaintiff; |
| 9 | Before me, _____, on this day | 10 | Mr. Eric Yollick, Attorney for the Defendant; |
| | personally appeared RANDY WILLIAMS, known to me (or proved to | 11 | Mr. Michael Durrschmidt, Attorney for the Defendant; |
| 10 | me under oath or through _____ | 12 | I further certify that I am neither counsel for, related |
| | (description of identity card or other document)) to be the | 13 | to, nor employed by any of the parties or attorneys in the |
| 11 | person whose name is subscribed to the foregoing instrument and | 14 | action in which this proceeding was taken, and further that I |
| | acknowledged to me that they executed the same for the purposes | 15 | am not financially or otherwise interested in the outcome of |
| | and consideration therein expressed. | 16 | the action. |
| 12 | Given under my hand and seal of office this _____ day | 17 | Further certification requirements pursuant to Rule 203 of |
| | of _____. | 18 | TRCP will be certified to after they have occurred. |
| 13 | | 19 | Certified to by me this _____, 2010. |
| 14 | | 20 | |
| 15 | _____ | 21 | |
| 16 | NOTARY PUBLIC IN AND FOR THE STATE OF _____ COMMISSION EXPIRES: _____ | 22 | Marisol Ramos Texas CSR No. 8140 |
| 17 | | 23 | Expiration Date: 12/31/12 Firm Registration No. 189 |
| 18 | | 24 | Southwest Reporting and Video Service, Inc. |
| 19 | | 25 | 826 Heights Blvd. Houston, Texas 77007 |
| 20-25 | | | |

17 (Pages 62 to 65)

**Randy Williams**

66

```
 1          FURTHER CERTIFICATION UNDER RULE 203 TRCP
 2
 3          The original deposition was/was not returned to the
 4     deposition officer on _____;
 5          If returned, the attached Changes and Signature page
 6     contains any changes and the reasons therefor;
 7          If returned, the original deposition was delivered to
 8     _____, Custodial Attorney;
 9          That $_____ is the deposition officer's charges to the
10     Defendant for preparing the original deposition transcript and
11     any copies of exhibits;
12          That the deposition was delivered in accordance with Rule
13     203.3, and that a copy of this certificate was served on all
14     parties shown herein on and filed with the Clerk.
15          Certified to by me this _____ day of
16     _____, 2010.
17
18
19          Marisol Rae Ramos
            _____
            Marisol Ramos
20          Texas CSR No. 8140
            Expiration Date:  12/31/12
21          Firm Registration No. 189
            Southwest Reporting and
22          Video Service, Inc.
            826 Heights Blvd.
23          Houston, Texas 77007
            (713)650-1800
24
25
```